RAFIQ SABIR & JAMES CONYERS,
    *Plaintiffs*,

v.                                              No. 3:17-cv-749 (VAB)

D.K. WILLIAMS. *et. al.*,
    *Defendants.*

## RULING ON MOTION TO DISMISS

Rafiq Sabir and James Conyers (collectively "Plaintiffs") have sued D.K. Williams and Herman Quay in their individual and official capacities and Hugh Hurwitz in his official capacity (collectively "Defendants") for declaratory and injunctive relief, compensatotory, nominal, and punitive damages, costs, and attorney's fees for violations of the First Amendment and Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq* ("RFRA"). Second Amended Complaint, ECF No. 36 ("Second Am. Compl."), at 13–15.

Defendants have moved to dismiss the Second Amended Complaint, Motion to Dismiss Second Amended Complaint, ECF No. 54. Defendants have since supplemented their motion to dismiss twice because the Federal Bureau of Prisons transferred Mr. Conyers to a lower security institution, *see* First Motion to Supplement Motion to Dismiss, ECF No. 72, and Mr. Sabir to another federal facility based on his alleged participation in a hunger strike, *see* Second Motion to Supplement Motion to Dismiss, ECF No. 76.

For the foregoing reasons, the Court **DENIES** the motion to dismiss, **GRANTS** the first supplemental motion to dismiss, and **DENIES** the second supplemental motion to dismiss.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

According to Plaintiffs, "[a] central tenet of Islam is the obligation for adult Muslims to

pray—perform *salah*—five times each day." Second Am. Compl. at ¶ 1. And "[m]any Muslims also believe that it is vital to perform *salah* in a group setting if there are other Muslims in the vicinity during prayer times." *Id.* The Friday early afternoon payer allegedly is the most important and "many Muslims believe must be prayed in a congregation." *Id.* at ¶ 19. For these practitioners, "engaging in congregational prayer with the maximum number of practicing Muslims possible is required because such prayers multiplies the blessings and utility of prayer." *Id.*

According to Plaintiffs, the Danbury Federal Correctional Institution ("FCI Danbury") is comprised of three institutions: (1) "Federal Prison Camp Danbury, a minimum-security prison housing approximately 194 persons;" (2) "Federal Satellite Low Danbury, a low-security all-female facility housing approximately 115 persons; and (3) "FCI Danbury, a low-security [Federal Board of Prisons] facility housing approximately 836 incarcerated persons." *Id.* at ¶ 27. Plaintiffs allege that the FCI Danbury facility has several recreational facilities that "includes a recreation yard, weight room, gymnasium, bathroom, wellness room, hobbycraft, music room, video viewing area with game tables, the chapel facilities, and several offices." *Id.* at ¶ 29. Moreover, Plaintiffs allege that "the medical area, food services, educational and housing facilities, laundry, the barber shop, and the prison work program area" are all accessible to incarcerated persons. *Id.*

Both Plaintiffs state that they are practicing Muslims that "share the sincerely-held belief that their religion requires them to engage in daily congregational prayer whenever possible." *Id.* at ¶ 2. Mr. Sabir claims that he has been a practicing Muslim for forty years and resided at FCI Danbury from June 2014 until July 12, 2019. *Id.* at ¶ 12; Declaration of Cheryl Magnusson, Ex. A, ECF No. 76-1. Mr. Conyers claims that he has been a practicing Muslim for twenty-one years

and resided at FCI Danbury from September 2016 until June 20, 2019. Second Am. Compl. at ¶ 13; Declaration of Cheryl Magnusson, Ex. A., ECF No. 72-1. Plaintiffs allege that "approximately 150 of the persons incarcerated at FCI Danbury currently identify as Muslim." Compl. at ¶ 28.

While the Federal Bureau of Prisons allegedly does not have a formal policy banning congregational prayer, Plaintiffs allege that "the warden of each correctional faciltiy within [the Federal Bureau of Prisons] is tasked with determining whether any specific religious practice jeopardizes the facility's safety and security." *Id.* at ¶ 24. Plaintiffs allege that "the warden is authorized to temporarily restrict the practice and/or identify an alternative practice." *Id.*

### A.    Factual Allegations

On March 24, 2014, Maureen Baird, then-Warden of FCI Danbury, allegedly "issued a policy that categorically limited the ability of Plaintiffs and other Muslim incarcerated pesons to engage in congregational prayer." *Id.* at ¶¶ 3 (citing FCI Danbury Institution Supplement No. DAN 5360.09F § 3(b)(2)); ¶ 30 (citing the text of the "Policy"). The Policy prohibits prayer in groups of more than two in all parts of FCI Danbury, except the chapel facility. *Id.* Due to limited chapel availability, Plaintiffs allege that "the Policy effectively bans congregational prayer in FCI Danbury, making it impossible for Plaintiffs and other Muslim incarcerated person to perform *salah* in accordance with their sincerely held religious beliefs." *Id.* at ¶ 3.

In October 2014, while engaged in prayer with several other incarcerated persons in FCI Danbury's auditorium, Mr. Sabir alleges that a corrections officer dispersed the group and warned Mr. Sabir that he would face discipline if he violated the prison policy by engaging in congregational prayer. *Id.* at ¶ 5. Mr. Sabir alleges that he and his fellow inmates "conducted themselves peacefully, respectfully, and cooperatively, and they did not interfere with other

incarcerated persons or the functioning and operation of FCI Danbury." *Id.* at ¶ 36. When told

that further congregational prayer would result in discipline, Mr. Sabir and other incarcerated

persons allegedly "informed the corrections officers that their religion demanded they engage in

congressional prayer five times a day and that the chapel facility was not available for them

during all those times." *Id.* at ¶ 40. But Plaintiffs allege that corrections officers merely reiterated

the terms of the Policy. *Id.* Since the incident, Mr. Sabir alleges that he has been "fearful that if

he engages in daily congregational prayer he will be subjected to discipline and sanction." *Id.*

at ¶ 41.

In Spring 2017, Plaintiffs allege that "officials at FCI Danbury circulated a flyer to the

incarcerated persons which cited to the Policy and stated that 'group prayer of 3 or more is

restricted to the Chapel' and 'Staff Will be Enforcing this Policy.'" *Id.* at ¶ 46.

 In April 2018, Plaintiffs allege that "another group of Muslim incarcerated persons were

threatened with discipline for engaging in congregational prayer in violation of the Policy." *Id.*

at ¶ 5. Plaintiffs allege that several staff members approached "several Muslim incarcerated

persons who were engaged in congregational prayer and informed them that they would be

issued disciplinary write-ups and face other sanctions if they continued to engage in

congregational prayer." *Id.* at ¶ 45.

Plaintiffs also allege that "at least two other Muslim incarcerated persons at FCI Danbury

have filed grievances against the Policy and its restriction on congregational prayer." *Id.* at ¶ 46.

Due to these and other incidents, Plaintiffs allege that "Plaintiffs and other Muslim

incarcerated persona at FCI Danbury are unable to adhere to their sincerely-held religious beliefs

and engage in daily congregational prayer," which "imposes a substantial burden on Plaintiff's

exercise of religion." *Id.* at ¶ 6.

Plaintiffs allege that FCI Danbury, a low-security facility, otherwise allows incarcerated persona a high degree of personal autonomy. *Id.* at ¶ 28. Indeed, Plaintiffs allege that "[m]any of the housing units do not have locks on the doors of the living quarters." *Id.* Plaintiffs also allege that incarcerated persons "routinely gather in large groups for prison-approved activities such as inmate-led fitness classes, card games, and sports, some of which can involve over 20 incarcerated persons at a time." *Id.*

Although FCI Danbury permits congregational prayer in the chapel facility, Plaintiffs allege that there is limited access to the facility, which "is only open when chapel staff are present and the facility's rooms are not already occupied or reserved by other individuals." *Id.* at ¶ 32. Plaintiffs also allege that the prison staff apply the Policy strictly in recreational areas but not in other areas, with the application of the Policy varying widely based on the staff members working at that time. *Id.* at ¶¶ 47, 50.

During his time at Federal Medical Center Devens, Mr. Sabir alleges that the Warden permitted open congregational prayer throughout the facility and without restriction. *Id.* at ¶ 25. Mr. Conyers alleges that incarcerated persons at other Federal Bureau of Prisons facilities, "including Federal Medical Center Butner, Federal Prison Camp at Fort Dix," permitted daily congregational prayer. *Id.* at ¶ 26.

Plaintiffs maintain a "sincerely-held religious belief that if two or more Muslims are together at a time of required prayer, they must pray together behind one prayer leader; and that it is not possible to break up into smaller groups." *Id.* at ¶ 23. Due to their inability to perform congregational prayer, Plaintiffs allege that they "have been forced to choose between acting in accordance with their sincere religious beliefs and facing discipline at the prison, including possible solitary confinement and loss of other privileges," which the Plaintiffs allege has caused

them mental and physical stress. *Id.* at ¶ 44.

Plaintiffs allege that they have exhausted all grievance processes and administrative remedies available to them. *Id.* at ¶¶ 51–54.

### B.    Procedural History

On May 8, 2017, Mr. Sabir, then proceeding *pro se*, filed a Complaint in this case. Complaint, ECF No. 1.

That same day, Mr. Sabir moved to proceed *in forma pauperis* and to appoint counsel. Motion for Leave to Proceed *in forma pauperis*, ECF No. 2; Motion to Appoint Counsel, ECF No. 3.

On May 25, 2017, the Court denied the motion to appoint counsel and motion for leave to proceed *in forma pauperis*. Order, ECF No. 5.

On June 5, 2017, Mr. Sabir moved for class action status. Motion for Class Action Status, ECF No. 6.

On June 29, 2017, the case was dismissed because Mr. Sabir failed to pay the filing fee. Order Dismissing Case, ECF No. 7.

On July 21, 2017, Mr. Sabir moved to re-open the case. Motion to Reopen Case, ECF No. 9.

On October 19, 2017, the Court granted the motion to re-open the case, but dismissed the case in an initial review order. Order, ECF No. 11.

On November 30, 2017, Mr. Sabir moved to amend his Complaint. Motion to Amend, ECF No. 15.

On December 19, 2017, the Court granted Mr. Sabir's motion to re-open the case and amend his Complaint, allowing Mr. Sabir's First Amendment and Religious Freedom

Restoration Act claims to proceed against Defendants in their official capacities for injunctive and declaratory relief. Order, ECF No. 16.

On June 1, 2018, Plaintiffs filed a Second Amended Complaint. Second Am. Compl.

On July 5, 2018, the Court held a telephonic status conference and issued a scheduling order. Minute Entry, ECF No. 48; Scheduling Order, ECF No. 49.

On September, 2018, Defendants moved to dismiss the Second Amdended Complaint. Motion to Dismiss, ECF No. 54.

On November 2, 2018, Plaintiffs filed a memorandum in opposition to the motion to dismiss. Memorandum in Opposition to Motion to Dismiss, ECF No. 60 ("Mem. in Opp. to MTD").

On November 16, 2018, Defendants replied to Plaintiffs memorandum in opposition. Reply to Response, ECF No. 61 ("Reply").

On June 21, 2019, Defendants supplemented their motion to dismiss because the Federal Bureau of Prisons transferred Mr. Conyers to a lower security institution. First Motion to Supplement Motion to Dismiss, ECF No. 72.

On June 25, 2019, the Court held a hearing regarding Defendants' motion to dismiss. Minute Entry, ECF No. 73.

On July 12, 2019, Defendants supplemented their motion to dismiss because the Federal Bureau of Prisons transferred Mr. Sabir to another federal facility based on his alleged participation in a hunger strike. Second Motion to Supplement Motion to Dismiss, ECF No. 76.

On August 2, 2019, Plaintiffs filed a memorandum in opposition to Defendants supplmental motion to dismsiss. Memorandum in Opposition to Motion to Supplement Pending Motion, ECF No. 79.

On August 15, 2019, Defendants filed a Reply to Plaintiffs' Memorandum in Opposition. Reply to Response, ECF No. 80.

## II.     STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A court will dismiss any claim that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), the court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Those "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Id.* Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. The complaint therefore must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

At this stage, a court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. A court also will view the factual allegations in the light most favorable to the plaintiff, and a court will draw all inferences in favor of the plaintiff. *See Cohen v. S.A.C. Trading Corp.*,

711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

A court considering motions to dismiss under Rule 12(b)(6) limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

## III. DISCUSSION

### A. Mr. Conyers' Declaratory and Injunctive Relief Claims

As an initial matter, Defendants have supplemented their motion to dismiss asking the Court to find Mr. Conyers' declaratory and injunctive relief claims moot because he is no longer at the FCI Danbury facility. *See* First Motion to Supplement Motion to Dismiss, ECF No. 72. Plaintiffs do not object. *See* Memorandum in Opposition to Motion to Supplement Pending Motion, ECF No. 80.

The Court agrees.

In the Second Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). In doing so, the Second Circuit calls for courts to "moot all injunctive and declaratory claims" for individuals no longer incarcerated in the facility at issue. *Id.*

Here, Defendants have filed a declaration that the Bureau of Prisons transferred Mr. Conyers to another facility. *See* Declaration of Cheryl Magnusson, ECF No. 72-1, at ¶ 4. And

Plaintiffs do not oppose the dismissal of Mr. Conyers's official capacity claims. Plaintiff's Opposition to Defendants' Supplements to Motion to Dismiss, ECF No. 79. The Court therefore finds that Mr. Conyers' claims for declaratory and injunctive relief are moot as to all Defendants in their official capacities.

Accordingly, the Court will dismiss Mr. Conyers' claims for declaratory and injunctive relief.

**B.      Mr. Sabir's Declaratory and Injunctive Relief Claims**

Defendants have also filed a second supplemental motion to dismiss asking the Court to find Mr. Sabir's declaratory and injunctive relief claims moot because he is no longer at the FCI Danbury facility. *See* Second Motion to Supplement Motion to Dismiss, ECF No. 76.

In response, Plaintiffs do not oppose the Court dismissing their claims for injunctive and declaratory relief against Warden Williams but argue that declaratory and injunctive relief against Director Hurwitz in his official capacity is not moot because Mr. Sabir could be restricted from prayer at his new facility. Memorandum in Opposition to Motion to Supplement Pending Motion, ECF No. 80, at 3. Plaintiffs argue that if the conditions at Mr. Sabir's new facility are similar to those at FCI Danbury, then his claims are not rendered moot by simply transferring him to a new facility. *Id.* at 4–5. Plaintiffs also note that Defendants have not designated to them or the Court where Mr. Sabir will end up, nor have they argued that group prayer would be available at Mr. Sabir's new facility. *Id.* at 7–8.

Because it is not clear that Mr. Sabir's new facility will accommodate his prayer request and a declaration from Director Hurwitz recognizing the right to congregative prayer as unlawful would affect the entire federal prison system, Plaintiffs argue that Mr. Sabir's claims are not moot because of his transfer to a new facility. *Id.* at 7–10.

In reply, Defendants argue that Plaintiffs have not met their burden in showing that an exception to the mootness doctrine applies to this case. Reply to Response, ECF No. 80, at 2–4. Defendants then argue that while they believe Mr. Sabir waived his claim, the Court should nevertheless dismiss his claims because there is no evidence he will ever be subjected to FCI Danbury's religious congregation policy again. *Id.* at 4–5.

Defendants then argue that an order restricting Director Hurwitz from enjoining FCI Danbury from prohibiting congregational prayer for Mr. Sabir would have no effect on him or his present claims because of the change of facility. *Id.* at 5–6.

The Court disagrees.

While "[i]t is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility," *see Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (citations omitted), transfer does not automaticaly render claims against other prison officials moot, *see Salahuddin*, 467 F.3d at 272 (finding as moot all injunctive and declaratory relief against all defendants at a Plaintiff's previous facility after a transfer). At the same time, "federal courts lack jurisdiction to decide questions that cannot affect the rights of litigants in the case before them." *Davis v. N.Y.*, 316 F.3d 93, 99 (2d Cir. 2002) (citations omitted). And a case is moot where " it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (quoting *Associated Gen. Contractors of Conn. v. City of New Haven,* 41 F.3d 62, 66–67 (2d Cir. 1994)).

Here, Mr. Sabir's claims for injunctive and declaratory relief against Director Hurwitz are not moot becuase there is nothing to indicate that his alleged freedom of expression grievance will not continue at his new facility. When calling for a mootness determination, "party seeking

to have a case dismissed as moot bears a heavy burden," *see Lillbask ex. Rel. Mauclaire v. Conn. Dep't. of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005), and must show that "there is no reasonable expectation that the wrong will be repeated," *see United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). *See, e.g. Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) ("The heavy burden of persua[ding] the court that the challenged [voluntarily ceased] conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (citation omitted)).

While Plaintiffs do not oppose the Court dismissing their claims for injunctive and declaratory relief against Warden Williams, *see* Second Motion to Supplement Motion to Dismiss, ECF No. 76, at 3, they continue to argue the declaratory and injunctive relief claims against Director Hurwitz, *see id.* They argue that the Federal Bureau of Prisons "has no formal policy banning prayer in its facilities," *see* Compl. at ¶ 4, but still permits individual facilities to enforce policies that have "a chilling effect on the ability of Plaintiffs and other Muslim incarcerated persons to practice their faith in a manner consistent with their sincerely-held religious beliefs," *see id.* at ¶ 46.

Moreover, Defendants have not disclosed Mr. Sabir's permanent facility once his transfer is completed. *See* Declaration of Cheryl Magnusson, ECF No. 76-1, at ¶ 5. As a result, the Court cannot find that the alleged freedom of expression violation would not occur at Mr. Sabir's new facility or that future transfers will not bring Mr. Sabir back to FCI Danbury. The Court therefore finds that Defendants have failed to meet their burden to show that there is a reasonable expectaiton that Mr. Sabir's alleged constitutional violations will not be repeated.[1]

Accordingly, the Court will dismiss Mr. Sabir's declaratory and injunctive releief claims

---

[1] Of course, if Mr. Sabir has no viable claim at his new facility, Mr. Hurwitz can raise the issue of mootness again at a later stage of this proceeding.

saginst Defendants Williams and Quay. But the Court will not dismiss Mr. Sabir's declaratory

and injunctive relief claims against Director Hurwitz, at least right now. *See Salahuddin*, 467

F.3d at 272 (finding as moot all injunctive and declaratory relief against all defendants at a

Plaintiff's previous facility after a transfer).[2]

### C.     Monetary Damages Claims

The Supreme Court has stated that "official-capacity suits generally represent only

another way of pleading an action against an entity of which an officer is an agent." *Hafer v.*

*Melo*, 502 U.S. 21, 25 (1991) (citation and internal quotation marks omitted). In an official

capacity suit, "the real party in interest . . . is the governmental entity and not the named

official." *Id.* By contrast, individual capacity suits "seek to impose individual liability upon a

government officer for [her] actions under color of [] law." *Id.*

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies

from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (citation omitted).

Sovereign immunity, however, does not shield federal officials sued in their individual

capacities. *Lewis v. Clarke*, 137 S.Ct. 1285, 1291 (2017) ("[S]overeign immunity does not erect a

barrier against suits to impose individual and personal liability." (internal quotation marks

omitted)).

Defendants argue that Plaintiffs seeks to impermissibly expand *Bivens* to include a new

context, while there are multiple existing administrative and judicial avenues to challenge FCI

---

[2] If either Mr. Sabir or Mr. Conyers returns to FCI Danbury or transfers to facility with similar restrictions on congregative prayer, Plaintiffs then could return to this Court to resume their declaratory and injunctive relief claims without first exhausting administrative remedies or re-filing. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (recognizing that "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases"); *Craig v. Univ. of Conn. Health Ctr.*, No. 3:13–cv–00281– WWE, 2014 WL 4364530, at *2 (D. Conn. Sept. 3, 2014) ("In this instance, because part of plaintiff's complaint will survive on the merits, efficiency dictates that plaintiff not be forced to re-file the action. Such result would burden both parties.").

Danbury's prayer policy. Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, ECF No. 55 ("Mem. in Supp. of MTD."), at 6–8. Defendants argue that the Religious Freedom Restoration Act, Board of Prisons administrative remedy program, and other avenues of judicial relief caution against expanding *Bivens* to recognize a new First Amendment damages remedy. *Id.* at 8–11.

Defendants further argue that special factors counsel against court recognition of an implied cause of action under the First Amendment. *Id.* at 11. First, Congress has the primary role of regulating federal prisons and protecting religious rights—which Congress has exercised with the Religious Freedom Restoration Act, the Religious Land Use and Institutionalized Persons Act, and Prison Litigious Reform Act. *Id.* at 11–12. While Defendants agree that *Bivens* is the proper avenue to address individual wrongdoing, they argue that Congress should handle any shortcomings in agency policy. *Id.* at 12–13.

Defendants also argue that because Congress has delegated management of federal prisons to the Board of Prisons, asserting a *Bivens* remedy would implicate separation of powers and potential systemwide costs of individual lawsuits also counsel against expanding the *Bivens* doctrine to include First Amendment damages. *Id.* at 13–15.

Defendants further assert that the United States has not waived its sovereign immunity from suits for damages based on alleged employee constitutional violations. *Id.* at 26. To the extent Plaintiffs assert damages claims in their official capacities, the United states claims that those claims must fail. *Id.* at 23.

In response, Plaintiffs argue that the Court has already held that Mr. Sabir stated a plausible claim against Defendants on both First Amendment and Religious Freedom Restoration Act grounds. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss,

ECF No. 60 ("Mem. in Opp. to MTD."), at 4. Plaintiffs argue that the Second Amended Complaint only acts to bolster their claims and should survive the motion to dismiss because the same plausibility standard also applies now. *Id.* at 5. Because Plaintiffs allege punishment for engaging in congregative prayer in violation of the FCI Danbury Policy, they assert that the allegations are enough to survive a motion to dismiss. *Id.* at 6.

Moreover, Plaintiff asserts that they only seek money damages against the wardens in their individual capacity based on the Religious Freedom Restoration Act therefore "Plaintiffs need not, and do not, look to *Bivens* to seek damages." *Id.* at 7.

In reply, Defendants argue that the Court should dismiss Plaintiffs' First Amendment claim as a *Bivens* claim for money damages. Reply Memorandum in Support of Defendant's Motion to Dismiss, ECF No. 61 ("Reply Mem."), at 1. Because *Bivens* is the only avenue for damages under the First Amendment, Defendants argue that the Court should dismiss the First Amendment damages claim. *Id.* Even if there is an implied remedy under the Constitution, Defendants argue that qualified immunity is appropriate because there is no recognized right for federal inmates to congregate during prayer with the maximum number of practicing Muslims possible. *Id.* at 2.

Defendants also argue that qualified immunity bars Plaintiffs' damages claim under the Religious Freedom Restoration Act because no Supreme Court or Second Circuit decision has ever recognized the right for inmates to pray with the maximum number of practicing Muslims possible. *Id.* Defendants contend that any other formulation of the right asserted in this case is at too high a level of generality to deal with this conduct in the specific context of this case. *Id.* at 3. And Defendants argue that Plaintiffs improperly construed the initial screening order as evidence of the Complaint's plausibility. *Id.* at 10.

The Court disagrees, at least for now.

### 1. Religious Freedom Restoration Act

The RFRA states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability [unless] . . . application of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Congress enacted RFRA "in order to provide very broad protection for religious liberty." *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). RFRA places a more demanding burden on the government "to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Id.* at 864 (quoting *Burwell*, 573 U.S. at 728). The United States Supreme Court has held that RFRA is unconstitutional as applied to state law, *see City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), but it continues to apply to the federal government and its officers, *see Sossamon v. Tex.*, 563 U.S. 277, 281 (2011).

Here, FCI Danbury's policy of limiting group prayer of three or more persons to the chapel is arguably a substantial burden on the exercise of religion. As the Court has previously stated, "[c]onstruing his allegations liberally, Mr. Sabir has stated a plausible claim that the group prayer policy at FCI Danbury substantially burdens his ability to practice his Muslim religion." Ruling on Motion to Reopen and Amend Complaint, ECF No. 16, at 11. Further, Mr. Sabir's Second Amended Complaint has supplemented his claim in three ways.

First, the operative allegations detail the religious importance of congregational prayer. *See* Second Am. Compl. at ¶ 19 ("engaging in congregational prayer with the maximum number of practicing Muslims possible is required because such prayers multiplies the blessings and

utility of prayer"). Second, Plaintiffs established the burden the Policy has placed on his exercise of religion. *Id.* at ¶ 44 (recalling how Plaintiffs "have been forced to choose between acting in accordance with their sincere religious beliefs and facing discipline at the prison, including possible solitary confinement and loss of other privileges"). Third, Plaintiffs alleged that FCI Danbury only applies this sort of burden to religious activities, while other group activities continued unencumbered. *Id.* at ¶ 28 (recounting how incarcerated people "routinely gather in large groups for prison-approved activities such as inmate-led fitness classes, card games, and sports, some of which can involve over 20 incarcerated persons at a time").

Courts have interpreted RFRA to include broad religious protections that allow for damages against federal officials in their individual capacity. Indeed, as the Supreme Court has stated, Congress sought "to provide very broad protection for religious liberty." *Burwell*, 573 U.S. at 693. The statute permits any "person whose religious exercise has been burdened in violation of [the statute]" to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). And the Second Circuit has held that "RFRA authorizes the recovery of money damages against federal officers sued in their individual capacities." *Tanvir v. Tanzin*, 894 F.3d 449, 463 (2d Cir. 2018).

Accordingly, Mr. Sabir may assert claims for monetary damages against Defendants in their individual capacities under RFRA.

### 2. Qualified Immunity

"A federal official performing administrative or discretionary functions may be entitled to qualified immunity rather than absolute immunity." *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999) (citation omitted). Qualified immunity shields government officials 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Id.* (citing *Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir. 1998)).

Qualified immunity shields federal officials from money damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Defendants argue that there is no clearly established right to pray in all areas of a federal prison with the maximum number of practicing Muslims possible. Defendants assert that there is no Supreme Court or Second Circuit decision placing federal prison wardens on notice that limiting group prayer violates the First Amendment or Religious Freedom Restoration Act. Mem. in Supp. of MTD. at 17. Moreover, district courts have not established a right to engage in group prayer anywhere within the correctional facility. *Id.* at 18. In the absence of clear legal authority putting them on notice, Defendants argue that the individual officials in this case are entitled to qualified immunity. *Id.* at 19.

Defendants further argue that their conduct did not violate a constitutional or statutory right. Because the wardens acted in a supervisory capacity, Defendants assert that there was no personal involvement or an affirmative causal link between any Defendant's actions and Plaintiffs' injuries. *Id.* at 22–23. Defendants therefore argue that personal liability cannot flow from implementation of preexisting prison policy. *Id.* at 23–25. Because Plaintiffs can only allege one instance of the Policy having impacted their ability to pray in a group, Defendants assert that Plaintiffs have not alleged a plausible claim that the Policy hindered performance of

their religious obligations. *Id.* at 26.

In response, Plaintiffs argue that weighing the qualified immunity defense is premature, and better addressed at a later stage of this litigation. Mem. in Opp. to MTD. at 7. Even then, qualified immunity does not apply to Defendants Williams and Quay because they violated clearly established First Amendment and Religious Freedom Restoration Act rights in implementing the Policy. *Id.* at 8–9. According to Plaintiffs, Defendants were on notice that substantially burdening Plaintiffs' religion without sufficient justification violates clearly established constitutional and statutory rights. *Id.* at 9. Because the contours of the question of how Defendants violated Plaintiffs rights is a factual one, Plaintiffs argue that the Court should not make a final qualified immunity determination until summary judgment. *Id.* at 11.

In addition, Plaintiffs argue that the burden placed on the exercise of their religious beliefs was not objectively reasonable. *Id.* at 12. Because the burden placed on the exercise of Plaintiffs' sincerely-held religious beliefs is inconsistent with other authorized group activities, Plaintiffs argue that the Court should find that no reasonable prison official should have maintained the Policy.

Finally, Plaintiffs argue that, at the pleading stage, the Complaint should survive a motion to dismiss based on lack of personal involvement because the Defendant Quay was Warden when Mr. Sabir filed his administrative grievance, Defendant Williams was Warden when Mr. Conyers filed his administrative grievance, and Defendant Williams was Warden when the flyer was circulated restricting group prayer to the chapel. *Id.* at 14. Because a person who denies a prisoner's grievance is personally involved in the deprivation of rights, the Court should afford Plaintiffs the opportunity to seek further evidence of their claims. *Id.* at 14–15.

In the Second Circuit, "a defendant presenting an immunity defense on a Rule 12(b)(6)

motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). At this stage, the Court must take all factual allegations in the Complaint as true. *Iqbal*, 556 U.S. at 678. And the Court will, as it must at this stage of the case, view the factual allegations in the light most favorable to the plaintiff and draw all inferences in favor of the plaintiff. *See York*, 286 F.3d at 125 ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

Here, Plaintiffs have plausibly alleged conditions that deprived him of his freedom to exercise his Muslim religion. Specifically, Plaintiffs allege that "Plaintiffs and other Muslim incarcerated persona at FCI Danbury are unable to adhere to their sincerely-held religious beliefs and engage in daily congregational prayer," which "imposes a substantial burden on Plaintiff's exercise of religion." Compl. at ¶ 6. The freedom of exercise, however, "often involves not only belief and profession but the performance of . . . physical acts such as assembling with others for a worship service." *Cutter v. Wilkinson* 544 U.S. 709, 721 (2005) (quoting *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)) (alterations omitted). While Plaintiffs can pray in the chapel, Plaintiffs allege that facility "is only open when chapel staff are present and the facility's rooms are not already occupied or reserved by other individuals." Compl. at ¶ 32. And those restrictions on the access to the facility and exercise of Plaintiffs religion may violate clearly established First Amendment case law and the RFRA statute.

As a result, it is plausible—at this stage—that qualified immunity would not shield Defendants from liability in their individual capacities. A court still "must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," *see Pearson,* 555 U.S. at 232 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), and

summary judgment is more appropriate for such a determination, *see Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013) ("Although federal officials' claims of qualified immunity should be decided as early as possible in a case, it would be premature to dismiss the case now on this basis. Rather, as we have noted previously, qualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed" (citation omitted)); *see also Castro v. United States,* 34 F.3d 106, 112 (2d Cir. 1994) ( "Although a defense of qualified immunity should ordinarily be decided at the earliest possible stage in litigation, and it is a defense that often can and should be decided on a motion for summary judgment, some limited and carefully tailored discovery may be needed before summary judgment will be appropriate." (internal citations and quotation marks omitted)).[3]

Accordingly, the Court denies the motion to dismiss as to Plaintiffs' individual capacity claims. *See Behrens v. Pelletier,* 516 U.S. 299, 307–08 (1996) (affirming that a defendant may raise the qualified immunity defense at successive stages).

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion to dismiss, **GRANTS** the first supplemental motion to dismiss, and **DENIES** the second supplemental motion to dismiss.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of August 2019.

>    /s/ Victor A. Bolden
> VICTOR A. BOLDEN
> UNITED STATES DISTRICT JUDGE

---

[3] Significantly, the Second Circuit in *Salahuddin* addressed qualified immunity arguments relating to a religious liberty claim at the summary judgment stage and, even at that later stage, found the granting of a motion for summary judgment on qualified immunity grounds inappropriate. *See Salahuddin*, 467 F.3d at 275–76 ("Qualified immunity is not appropriate at this stage because it was clearly established at the time of the alleged violations that prison officials may not substantially burden inmates' right to religious exercise without some justification and because we cannot say as a matter of law that it was objectively reasonable for any defendant to believe that the facts as they stand on summary judgment showed no violation of a clearly established right. Accordingly, these issues remain to be resolved in further proceedings.").